**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| HENRY KWONG, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CARDINAL FINANCIAL CORPORATION, BERNARD H. CLINEBURG, SIDNEY O. DEWBERRY, BUDDY G. BECK, WILLIAM G. BUCK, MICHAEL A. GARCIA, J. HAMILTON LAMBERT, WILLIAM E. PETERSON, ALICE M. STARR, STEVEN M. WILTSE, BARBARA B. LANG, and WILLIAM J. NASSETTA,<br><br>Defendants. | CONSOLIDATED CASE NO: 1:16-CV-1582<br><br>Consolidated with: 1:17-CV-44 |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs Henry Kwong and Kyle Miller ("Plaintiffs"), by and through their attorneys, allege upon personal knowledge as to themselves, and upon information and belief based upon, among other things, the investigation of counsel as to all other allegations herein, as follows:

## SUMMARY OF THE ACTION

1. This is a shareholder action brought by Plaintiffs, on behalf of themselves and other public holders of the common stock of Cardinal Financial Corporation ("Cardinal" or the "Company"), against Cardinal and its Board of Directors (the "Individual Defendants" or the "Board") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78n(a) and 78t(a), and Rules and Regulations promulgated thereunder, including Rule 14a-9, 17 C.F.R. §240.14a-9, in connection with the proposed merger

of Cardinal with UBV Holding Company, LLC ("Merger Sub"), a wholly owned subsidiary of United Bankshares, Inc. ("United").

2. Cardinal operates as a multi-bank holding company. The Company's banks offer a variety of banking products to individuals, professionals, and small to medium-sized businesses in northern Virginia. Cardinal also operates an investment advisory company.

3. On August 18, 2016, Cardinal and United jointly announced that they had entered into a definitive agreement (the "Merger Agreement") pursuant to which United would acquire Cardinal in a stock for stock transaction. Pursuant to the Merger Agreement, United will acquire all of the outstanding shares of Cardinal for 0.71 United shares per Cardinal share (the "Proposed Transaction"). As of the date of the announcement, the per share consideration for Cardinal shareholders had an implied value of approximately $27.69 and the aggregate consideration was worth approximately $912 million.

4. To induce Cardinal's public shareholders to vote in favor of the Proposed Transaction, on December 9, 2016, in violation of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9, Defendants caused to be filed with the U.S. Securities and Exchange Commission (the "SEC") a materially false and misleading prospectus and joint proxy statement, incorporated into the Form S-4 Registration Statement filed by United. United filed an amended prospectus and joint proxy statement, incorporated into the Form S-4/A Registration Statement on February 3, 2017 (the "Registration Statement" or "Proxy")). Among other things, the Proxy contains the unanimous recommendation of the Board that Cardinal shareholders vote "for" the proposal to adopt the Merger Agreement. As detailed herein, the Proxy is deficient and misleading in that it fails to provide adequate disclosure of all material information related to the Proposed Transaction.

5. For these reasons, and as set forth in detail herein, Plaintiffs seeks to enjoin the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction under 28 U.S.C. § 1331, pursuant to 15 U.S.C. § 78aa (federal question jurisdiction), as Plaintiffs allege violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

7. The Court has personal jurisdiction over each of the Defendants because each either is a corporation that is incorporated under the laws of, conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because: (a) one or more of the Defendants either resides in or maintains executive offices here; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

## PARTIES

9. Plaintiffs are, and were at all times relevant hereto, holders of Cardinal common stock.

10. Defendant Cardinal is a Virginia bank holding company incorporated in Virginia, with its principal place of business at 8270 Greensboro Drive, Suite 500, McLean, Virginia 22102.

11. Defendant Bernard H. Clineberg has served as Chairman and as a Director of the Company.

12. Defendant Sidney O. Dewberry has served as Lead Director of the Company.

13. Defendant Buddy G. Beck has served as a Director of the Company.

14. Defendant William G. Buck has served as a Director of the Company.

15. Defendant Michael A. Garcia has served as a Director of the Company.

16. Defendant J. Hamilton Lambert has served as a Director of the Company.

17. Defendant William E. Peterson has served as a Director of the Company.

18. Defendant Alice M. Starr has served as a Director of the Company.

19. Defendant Steven M. Wiltse has served as a Director of the Company.

20. Defendant Barbara B. Lang has served as a Director of the Company.

21. Defendant William J. Nassetta has served as a Director of the Company.

22. Defendants Clineburg, Dewberry, Beck, Buck, Garcia, Lambert, Peterson, Starr, Wiltse, Lang, and Nassetta are collectively referred to herein as the "Board" or the "Individual Defendants."

23. The Individual Defendants and Cardinal are referred to as "Defendants."

24. Non-party United is a bank holding company incorporated in West Virginia, with its principal place of business in Charleston, West Virginia.

25. Non-party Merger Sub is a Virginia limited liability company, having its principal place of business in Fairfax, Virginia and is a wholly owned subsidiary of United.

## SUBSTANTIVE ALLEGATIONS

### The Sales Process and Related Omissions in the Proxy

26. According to the Proxy, on April 5, 2016, the executive committee of Cardinal's Board, consisting of Defendants Clineburg (chairman), William G. Buck, Sidney O. Dewberry and Michael A. Garcia, met with representatives of Sandler O'Neill & Partners, L.P. ("Sandler O'Neill" or "Sandler"), who provided information on the current market conditions in the banking

industry, recent merger and acquisition activity, a preliminary valuation range of Cardinal's franchise position and an analysis of various strategic alternatives.

27. Sandler O'Neill's presentation included a list of potential acquirers that they believed would be interested in entering or expanding in the Washington, D.C. market by a merger transaction with Cardinal.

28. On April 8, 2016, the Board took action by unanimous written consent to approve the engagement of Sandler O'Neill to act as Cardinal's financial advisor in connection with a potential business combination, which engagement was formally entered into on April 18, 2016. However, the Proxy fails to disclose how the Board considered and resolved the potential conflicts of interest relating to Sandler and the potential counter-parties it was contacting, including United.

29. On May 17, 2016, Sandler O'Neill began contacting the companies on the approved potential merger partner list, including United.

30. In total, 18 potential merger partners were contacted, of which just three received nondisclosure agreements. Purportedly, only United signed such an agreement, received the confidential information memorandum and was granted access to Cardinal's electronic data room.

31. On May 23, 2016, Richard M. Adams, Chairman and Chief Executive Officer of United, Defendants Clineburg, Buck, Cardinal's Lead Independent Director and of Sandler O'Neill held an in-person meeting. At this meeting, Mr. Adams expressed strong interest in pursuing a potential acquisition of Cardinal for 0.71 shares of United common stock for each share of Cardinal common stock.

32. During late May-early June 2016, Sandler O'Neill continued to contact financial institutions to seek their interest in a business combination with Cardinal. The Proxy discloses that Sandler contacted eighteen parties before this effort, but fails to disclose the number contacted during it, apart from noting that one of the parties contacted had an interest but was enmeshed in

its own merger discussions. Additionally, the Proxy fails to disclose whether any of these parties entered into confidentiality stipulations with Cardinal, and if so, whether such confidentiality stipulations contain standstill provisions.

33. At the end of the marketing process, there was, purportedly, one interested party other than United that could have made an offer to Cardinal that, from a financial point of view, was in the range of what the Cardinal board was willing to accept. However, such party declined to make an offer because it was involved in another merger transaction.

34. On June 15, 2016, less than one month into the "sales process," the Board determined to postpone, for a period of 30 days, any decision with respect to the marketing process in order to allow United to move forward on an exclusive basis.

35. In early July 2016, Mr. Adams informed Sandler O'Neill and Clineburg that United was willing to move forward with a transaction with Cardinal at the exchange ratio discussed in May 2016 (0.71 shares of United common stock), subject to United's further due diligence on Cardinal.

36. On July 20, 2016, the Board met, with Sandler O'Neill present. Sandler O'Neill provided a preliminary analysis regarding Cardinal, United and a merger transaction based on publicly available information on the parties and the proposed 0.71 exchange ratio.

37. At the July 20, 2016 Board meeting, Sandler O'Neill stated that the offer from United included a built-in assumption that it would raise capital in connection with the completion of a merger with Cardinal. Based on this new information, Sandler O'Neill's presentation included assumptions that United would issue approximately $200 million of non-cumulative perpetual preferred stock with a dividend of 6.50% at or around the time of the closing of a merger.

38. Over the next two weeks, United and Cardinal negotiated and came to an understanding with respect to the merger's provisions. During such period, United finally

conducted due diligence on Cardinal, utilizing "confidential information" made available by Cardinal.

39. On August 17, 2016, the Board met and "determined" that the Proposed Transaction is in the best interest of Cardinal and its shareholders and voted "unanimously" to adopt and approve the Merger Agreement, and to recommend approval of the Merger Agreement to the shareholders of Cardinal.

40. In the Registration Statement filed by United on December 9, 2016, United announced its intent to raise additional capital by issuing $200,000,000 in non-cumulative perpetual preferred stock in connection with the Proposed Transaction.

41. On December 16, 2016, United filed a prospectus supplement and accompanying prospectus ("Prospectus") announcing that they are offering 4,330,000 shares of common stock, $2.50 par value per share. Although, the Prospectus noted that this common stock offering is in lieu of United's previously disclosed intention to issue the preferred stock, the Registration Statement, as amended on February 3, 2017, misleadingly continues to refer to the preferred share issuance as a "potential" future event. In addition, the financial analyses that purport to demonstrate the fairness of the Proposed Transaction fail to account for the common share issuance, and are predicated on the stale assumption that United would raise additional capital (prior to the consummation of the Proposed Transaction) by issuing preferred, rather than common shares.

**The Proposed Transaction**

42. On August 18, 2016, Cardinal and United issued a joint press release announcing the Proposed Transaction as follows:

> United Bankshares, Inc. ("United") (NASDAQ: UBSI) Chairman and Chief Executive Officer, Richard M. Adams, announced the signing of a definitive merger agreement with Cardinal Financial Corporation ("Cardinal") (NASDAQ: CFNL), a publicly traded financial services holding company headquartered in Tysons Corner,

Virginia. This will mark the 31st acquisition of the current administration and the tenth acquisition for United in the D.C. Metro region, one of the most attractive financial markets in the country.

Cardinal, with $4.2 billion in assets, provides banking services through its subsidiary bank, Cardinal Bank, which has a network of 30 branches throughout Virginia, Maryland and Washington, D.C. In addition, Cardinal operates George Mason Mortgage, LLC, a residential mortgage lending subsidiary, and Cardinal Wealth Services, Inc., a wealth management services subsidiary. Upon completion of the merger, United's assets will grow to approximately $20 billion with a projected market capitalization of approximately $3.9 billion based on United's closing price on August 16, 2016. Based upon this projected market capitalization, United would be the 32nd largest banking company in the country.

Cardinal Bank will merge into United Bank, United's Virginia chartered bank, the largest community bank headquartered in the D.C. Metro region. Upon completion of the merger, United Bank will have assets of approximately $14.4 billion and will continue to have the #1 deposit market share among community banks in the Washington, D.C. Metropolitan Statistical Area (MSA).

United will acquire 100% of the outstanding shares of Cardinal in exchange for common shares of United. The exchange ratio will be fixed at 0.71 of United's shares for each share of Cardinal. The aggregate consideration of the transaction is approximately $912 million based on Cardinal's common shares outstanding of 32.5 million and options outstanding of 1.02 million. The announced price represents 2.24 times Cardinal's tangible book value at June 30, 2016.

The transaction was unanimously approved by United's and Cardinal's Boards of Directors and is expected to close mid-2017, pending regulatory approval and United and Cardinal shareholder approval.

Adams stated, "Cardinal is one of the most successful community banks in the country and has a significant presence in one of the best markets in the USA. This merger aligns perfectly with our long-standing commitment to growth in the D.C. Metro area. Both companies have strong ties to the local community, and share the goal of building meaningful relationships with the individuals, businesses, and organizations that contribute to its prosperity. By uniting, we reinforce our position as the largest locally headquartered community bank."

Bernard H. Clineburg, Executive Chairman of Cardinal stated, "We are pleased Cardinal found a like-minded partner to further our growth in Northern Virginia, the District of Columbia, and Maryland. United brings to the table the capacity to meet the sophisticated needs of our customers, while at the same time staying true to our commitment to the communities we serve. In addition, the transaction will add tremendous value for our shareholders." It is expected that Mr. Clineburg will join United's Board of Directors at the time of the merger.

> United currently has $14.3 billion in assets and 129 full-service offices in Washington, D.C., Virginia, Maryland, Ohio, Pennsylvania, and West Virginia.
>
> Keefe, Bruyette & Woods, Inc. served as financial advisor and Bowles Rice LLP provided legal counsel to United.
>
> Sandler O'Neill & Partners, L.P. served as financial advisor and LeClairRyan, A Professional Corporation served as legal counsel to Cardinal.

**The Materially Incomplete and Misleading Proxy**

43. Defendants filed, or caused to be filed, the Proxy with the SEC in connection with the Proposed Transaction. As alleged herein, the Proxy omits material information that must be disclosed to Cardinal's stockholders to enable them to render an informed decision with respect to the Proposed Transaction.

***Omissions and Misstatements Concerning Sandler's Conflicts of Interest***

44. The sales process that culminated in the Merger Agreement was tainted by significant conflicts of interest that are not fully disclosed. During the two-year period preceding the issuance of Sandler's fairness opinion, Sandler provided investment banking services to United and has received compensation for such services. However, the Proxy only discloses Sandler's "most recent[]" engagement by United, where Sandler acted as financial advisor to United in connection with its acquisition of Bank of Georgetown, which transaction closed on ***June 3, 2016***. United's acquisition of Bank of Georgetown, for which Sandler received a six figure fee from United, occurred, literally, in the middle of the "sales process" Sandler was purportedly running for Cardinal. The Proxy fails to disclose the full scope of services performed by Sandler for United over the past two years, how much compensation it received, when the Board first learned of and considered this conflict, and if/how the Board assured itself that this conflict would or would not infect the process here.

45. Further, according to the Proxy:

> Sandler O'Neill has advised the Cardinal board of directors that it may provide, and receive customary compensation for, investment banking services to United Bankshares in the future, including during the pendency of the merger. In addition, in the ordinary course of Sandler O'Neill's business as a broker-dealer, Sandler O'Neill may purchase securities from and sell securities to Cardinal and United Bankshares and its affiliates. Sandler O'Neill may also actively trade the equity and debt securities of Cardinal and United Bankshares or its affiliates for its own account and for the accounts of its customers.

Proxy at 81. While the Proxy states ambiguously that Sandler "may provide, and receive customary compensation for, investment banking services to United. . . including during the pendency of the merger," other than in connection with the acquisition of Bank of Georgetown, the Proxy does not indicate whether, in fact, any such work currently is being contemplated and, if so, the substance thereof and the compensation expected. Similarly, the Proxy states that Sandler "may purchase securities from and sell securities to Cardinal and United Bankshares and its affiliates" and "may also actively trade the equity and debt securities of Cardinal and United Bankshares or its affiliates." Yet, the Proxy does not identify any such past or current investment by Sandler or its affiliates or disclose any material facts with respect thereto. Nor does the Proxy indicate whether any such investment currently is being contemplated and, if so, who and what is involved. Such information is especially important to Cardinal shareholders in light of Sandler's clear conflict of interest here, as detailed above.

46. The failure to fully disclose this compensation and the nature of investment banking services Sandler contemplates performing for United during the pendency of the Proposed Transaction is a material omission that misleads Cardinal stockholders as to the degree of conflict faced by Sandler and its lack of objectivity when it opined on the purported fairness of the Proposed Transaction.

47. Among other things, the Proxy also fails to disclose critical information concerning each parties' managements' projections, and the opinion and analyses of Sandler, on which the Board purportedly relied. All this omitted information, if disclosed, would significantly alter the

total mix of information available to Cardinal's stockholders that they would rely upon in deciding how to vote on the Proposed Transaction.

***Omissions and Misstatements Concerning United's Capital Raise***

48. The Proxy materially misrepresents the impact of United's decision to issue 4,330,000 shares of common stock in lieu of the previously disclosed issuance of approximately $200 million in non-cumulative perpetual preferred stock in order to raise additional capital for the Proposed Transaction. The financial analyses of both Sandler and Keefe, Bruyette & Woods, Inc. ("KBW") were premised upon assumptions that United would issue $200,000,000 of non-cumulative perpetual ***preferred*** stock in connection with the Proposed Transaction. Neither financial advisors' work contemplated the issuance of 4,330,000 ***common*** shares by United to raise additional capital.

49. The Proxy specifically states that "Sandler O'Neill also received and used in its pro forma analyses certain assumptions relating to transaction costs, purchase accounting adjustments, expected cost savings, a core deposit intangible asset, a provision expense ***and United Bankshares' issuance of a certain amount of perpetual preferred stock, as provided by the senior management of United Bankshares."*** (Emphasis added).

50. Thus, it is clear that Sandler considered the preferred stock issuance, not the common stock issuance in its presentations. For example, on July 20, 2016, "Sandler O'Neill stated that the offer from United Bankshares included a built-in assumption that it would raise capital in connection with the completion of the potential merger with Cardinal. Based on this new information and discussions between the parties, Sandler O'Neill's presentation included assumptions that United Bankshares would issue approximately $200 million of non-cumulative perpetual preferred stock with a dividend of 6.50% at or around the time of the closing of the merger."

51. Similarly, the Proxy is clear that KBW's analyses also "assumed that any related transactions (including the bank subsidiary merger and United Bankshares' potential issuance of approximately $200,000,000 in non-cumulative perpetual preferred stock) would be completed substantially in accordance with the terms set forth in the merger agreement or as otherwise described to KBW by representatives of United Bankshares." Moreover, "KBW assumed, for purposes of certain of its analyses and KBW's opinion, the completion of United Bankshares' potential issuance of approximately $200,000,000 in non-cumulative perpetual preferred stock as described to KBW by representatives of United Bankshares."

52. The Proxy and the descriptions of the analyses of Sandler and KBW's analyses are misleading. While the Proxy states that both financial advisors considered a preferred share issuance, it fails to explicitly disclose that neither advisor considered or analyzed the impact of a common share issuance. By failing to disclose this information, Cardinal stockholders are being misled about the fact that the financial analyses conducted by the parties respective financial advisors ***did not*** contemplate the issuance of 4,330,000 common shares by United or the dilutive impact of the issuance; and, instead, are predicated on stale assumptions which are no longer valid.

53. Given the change in United's share issuance, Cardinal stockholders have been misled that Sandler's financial analysis and fairness opinion prepared in August 2016, presented unmodified in the Proxy, apply to United's new capital structure and the materially different value of consideration offered to Cardinal stockholders. Without corrective disclosure in the Proxy, Cardinal stockholders cannot make a fully-informed decision whether to vote to approve the Transaction because they do not have an understanding of the impact of the common share issuance on the Proposed Transaction, and are currently being misled regarding the fairness of the Proposed Transaction.

***Omissions and Misstatements Concerning Managements' Projections***

54. The Proxy also fails to disclose both Cardinal's and United's managements' financial projections for 2017-2020, and only discloses the respective "estimated long-term earnings per share growth rate[s]" for years 2018 through 2020. These omissions materially mislead Cardinal shareholders by presenting a single metric as determinative of the Company's standalone prospects, even while omitting the first year of the growth following the financial analyses of Sandler and KBW.

55. Moreover, according to the Proxy, in certain of its valuation analyses, Sandler relied on public information rather than the confidential financial information and projections concerning Cardinal and United. However, the Proxy fails to disclose the basis for Sandler's reliance on public (rather than management forecasts) or how this impacted Sandler's analyses during the July 20, 2016 meeting where preliminary analyses regarding Cardinal, United and a merger transaction was provided. Furthermore, the Proxy fails to disclose the "publicly available consensus mean and median analyst earnings per share estimates for Cardinal [and United] for the years ending December 31, 2016 and December 31, 2017" despite Sandler's reliance on these estimates.

56. Finally, the Proxy fails to disclose the projected dividend growth rate "discussed with and confirmed by senior management of Cardinal."

***Omissions and Misrepresentations Concerning Sandler's Analyses in Support of its Fairness Opinion***

57. With respect to Sandler's *Comparable Company Analyses*, the Proxy fails to disclose: (i) the basis for the excluding The Bancorp, Inc., and Xenith Bankshares, Inc. from the "Cardinal Peer Group;" and (ii) relevance of any of the statistics to the determination that the Proposed Transaction is fair. This omission materially misleads Cardinal shareholders as to the

accuracy and applicability of Sandler's analysis of comparable companies, and whether Sandler adjusted its analysis to favor the Proposed Transaction.

58. With respect to Sandler's *Analysis of Selected Merger Transactions*, the Proxy fails to provide the information concerning each of the transactions used in the analysis, including the premiums paid or the dates of the transactions. Without such material information, Cardinal shareholders cannot assess whether the transactions used by Sandler in its analysis were comparable or otherwise appropriate and whether the range of implied values of Cardinal common stock is reasonable. This omission materially misleads Cardinal shareholders as to the accuracy and applicability of Sandler's analysis of comparable mergers.

59. With respect to the *Net Present Value Analyses*, the Proxy fails to disclose (i) the methodology for determining 2020 earnings multiples ranging from 12.0x to 20.0x and 2020 tangible book values ranging from 160% to 235%; or (ii) the methodology for determining the 6.7%-11.7% discount rates applied to the terminal values. Additionally, the Proxy provides that Sandler used a "projected dividend growth rate, as discussed with and confirmed by senior management of Cardinal," yet does not disclose what this dividend growth rate was.

60. Here, where no other bidders came forward, these analyses are material and provide a benchmark by which to judge the consideration obtained in a transaction. Further information on the methodology is material where, as here, the Net Present Value Analyses provide a fairness range with a top price significantly above the proposed consideration. Thus, the details of Sandler's analyses are material to stockholders, and disclosing some, but not all, details misleads shareholders as to the financial adviser's basis for its fairness opinion.

61. Based on the foregoing, Cardinal's public shareholders lack critical information necessary to evaluate whether the Proposed Transaction truly maximizes shareholder value and serves their interests. Moreover, without the key financial information and related disclosures,

Cardinal's public shareholders cannot gauge the accuracy and reliability of the financial analyses performed by Sandler and whether they can reasonably rely on its fairness opinion.

62. Accordingly, Plaintiffs seek, among other things, the following relief: (i) enjoinment of the Proposed Transaction; or (ii) rescission of the Proposed Transaction in the event that it is consummated and to recover damages resulting from Defendants' misconduct.

## CLASS ACTION ALLEGATIONS

63. Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all holders of Cardinal common stock who are being and will be harmed by Defendants' actions described herein (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

64. This action is properly maintainable as a class action because:

(a) The Class is so numerous that joinder of all members is impracticable. As of December 19, 2016, there were over 32 million shares of Cardinal common stock issued and outstanding. The actual number of public stockholders of Cardinal will be ascertained through discovery;

(b) There are questions of law and fact that are common to the Class, including:

i) Whether Defendants violated Sections 14(a) and 20(a) of the Exchange Act in connection with the Proposed Transaction; and

ii) Whether Plaintiffs and the other members of the Class would suffer irreparable injury if the Proposed Transaction complained of herein were consummated.

(c) Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature. Plaintiffs' claims are typical of the

claims of the other members of the Class and Plaintiffs have the same interests as the other members of the Class. Accordingly, Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class;

(d) The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members of the Class not parties to the adjudications or substantially impair or impede their ability to protect their interests; and

(e) Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, injunctive relief on behalf of the Class as a whole is appropriate.

## FIRST CAUSE OF ACTION

**Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder**

65. Plaintiffs repeat and reallege each allegation set forth herein.

66. As detailed herein, Defendants disseminated the false and misleading Proxy specified above, which contained statements which, at the time and in the light of the circumstances under which they were made, were false and misleading with respect to material facts and which omitted to state material facts necessary in order to make the statements therein not false or misleading or necessary to correct earlier statements which had become false or misleading, in violation of Section 14(a) of the Exchange Act and SEC Rules promulgated thereunder, including SEC Rule 14a-9.

67. By the use of the mails and by means and instrumentalities of interstate commerce and the facility of a national securities exchange, Defendants solicited and permitted the use of

their names to solicit proxies or consents or authorizations in respect of the common stock of Cardinal.

68. By virtue of their positions within the Company, the Individual Defendants were aware of this information and of their duty to disclose this information in the Proxy. The Proxy was prepared, reviewed, and/or disseminated by Defendants. The Proxy misrepresented and omitted material facts, including material information about the unfair sale process for the Company, the unfair consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company's assets. Defendants were at least negligent in filing and disseminating the Proxy with these materially false and misleading statements and omissions. Defendants have also failed to correct the Proxy and the failure to update and correct false statements is also a violation of Section 14 of the Exchange Act and SEC Rules promulgated thereunder.

69. The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder would consider them important in deciding whether to vote in favor of and tender their shares in the Proposed Transaction. A reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

70. Plaintiffs have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiffs be fully protected from immediate and irreparable injury, which Defendants' actions threaten to inflict.

## SECOND CAUSE OF ACTION

### Against the Individual Defendants for Violation of Section 20(a) of the Exchange Act

71. Plaintiffs repeat and reallege each allegation set forth herein.

72. The Individual Defendants acted as controlling persons of Cardinal within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By virtue of their positions as

officers and directors of Cardinal and their participation in and awareness of the Company's business and operations and their intimate knowledge of the materially false statements and omissions contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.

73. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiffs to be false and misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

74. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. Among other things, the Proxy at issue contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. Thus, they were directly involved in the making of that document.

75. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy purports to describe the various issues and information that they reviewed and considered – descriptions which had input from the Individual Defendants.

76. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

77. Plaintiffs have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment and preliminary and permanent relief, including injunctive relief, in Plaintiffs' favor and in favor of the Class and against Defendants as follows:

A. Enjoining Defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Company adopts and implements a procedure or process to obtain the best available terms for shareholders;

B. Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof, or granting Plaintiffs and the Class rescissory damages;

D. Directing the Individual Defendants to account to Plaintiffs and the Class for all damages suffered as a result of the wrongdoing;

E. Awarding Plaintiffs and the Class the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F. Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs pray for a jury trial on all issues and in all proceedings so triable.

Dated: February 14, 2017

Respectfully submitted,

**FINKELSTEIN THOMPSON LLP**

*/s/ Robert O. Wilson*
Robert O. Wilson (VSB 77791)
Rosalee B.C. Thomas
1077 30th Street NW, Suite 150
Washington, DC 20007
Telephone: (202) 337-8000
Facsimile: (202) 337-8090
rwilson@finkelsteinthompson.com
rbcthomas@finkelsteinthompson.com

*Counsel for Plaintiffs*

OF COUNSEL:

**BROWER PIVEN**
A Professional Corporation
Daniel Kuznicki
475 Park Avenue South, 33rd Floor
New York, NY 10016
Telephone: (212) 501-9000
Facsimile: (212) 501-0300
kuznicki@browerpiven.com

**LEVI & KORSINSKY LLP**
Elizabeth K. Tripodi (VSB #73483)
1101 30th Street N.W., Suite 115
Washington, DC 20007
Telephone: (202) 524-4290
Facsimile: (202) 333-2121
etripodi@zlk.com

**CERTIFICATE OF SERVICE**

I certify that on February 14, 2017, I filed the foregoing using the Court's electronic filing system, which caused a notice of electronic filing to be sent to all counsel of record.

/s/ *Robert O. Wilson*
Robert O. Wilson (VSB 77791)
1077 30th Street NW, Suite 150
Washington, DC 20007
Telephone: (202) 337-8000
Facsimile: (202) 337-8090
rwilson@finkelsteinthompson.com